IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS

| | |
|---|---|
| ASSOCIATED BUILDERS AND CONTRACTORS OF TEXAS, INC., et al., <br><br> Plaintiffs, <br><br> v. <br><br> NATIONAL LABOR RELATIONS BOARD, <br><br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> )   Case No. 1:15-CV-00026 RP <br> ) <br> ) <br> ) <br> ) <br> ) |

## DEFENDANT NATIONAL LABOR RELATIONS BOARD'S
## REPLY IN SUPPORT OF ITS PARTIAL MOTION TO DISMISS AND CROSS-MOTION FOR SUMMARY JUDGMENT

NANCY E. KESSLER PLATT
*Deputy Assistant General Counsel*

DAWN L. GOLDSTEIN
KEVIN P. FLANAGAN
*Supervisory Attorneys*

PAUL A. THOMAS
DAVID H. MORI
MICHAEL ELLEMENT
IGOR VOLYNETS
*Attorneys*

BARBARA A. O'NEILL
*Assistant General Counsel for Contempt, Compliance, and Special Litigation*
Phone: (202) 273-2958
Fax: (202) 273-4244
E-mail: barbara.oneill@nlrb.gov

National Labor Relations Board
1099 14th Street, NW, Suite 10700
Washington, D.C. 20570

As the National Labor Relations Board (Board) has shown in its Memorandum in Support of Its Partial Motion to Dismiss and Cross-Motion for Summary Judgment (Bd. MSJ) [Dkt. 24-1], ABC's facial statutory challenges to the Board's representation case procedures rule (Rule) are not ripe. (Bd. MSJ 3-6). Even if they were ripe, they are without merit (*id.* at 12-21), as are ABC's further contentions that aspects of the Board's decisionmaking process were "arbitrary" or "capricious" under the Administrative Procedure Act (*id.* at 7-11, 22-24). As shown below, ABC's Opposition and Reply (Opp.) [Dkt. 26] does not remedy these fundamental and ultimately dispositive flaws.[1]

## I.     ABC's "appropriate hearing" and "time compression" claims are not ripe.

ABC fails to demonstrate the ripeness of its principal claims, namely, that the Rule does not provide for an "appropriate" pre-election hearing (Amendments (Ams.) 7-10) and impermissibly streamlines the election process (Ams. 5, 11, 15, and 17). As previously noted, the twin touchstones of ripeness are fitness for judicial review and hardship if review is denied. (Bd. MSJ 3). The amendments ABC principally challenges are not fit for review in their current posture, because they merely authorize the Board's regional directors (RDs) to exercise case-by-case discretion. Contrary to ABC's position (Opp. 2), highly discretionary standards like those at issue are ill-suited for facial challenges precisely because factual application of those standards *would* "significantly advance [the court's] ability to deal with the legal issues presented." *Texas v. United States*, 497 F.3d 491, 498 (5th Cir. 2007) (alteration in original). ABC cannot, and does not, dispute that the choices of an RD in a particular election *could* result in an election process that satisfies all of its criticisms—and under *Reno v. Flores*, that fact is fatal to a facial challenge. 507 U.S. 292, 301 (1993). ABC's rejoinder that it desires to go beyond "merely challenging individual discretionary acts" (Opp. 2) is a virtual concession that this suit is precisely the sort of "abstract disagreement over administrative policy"

---

[1] The parties have agreed to amend their prior stipulation [Dkt. 11] so that the Board may file the Joint Appendix on or before March 31, 2015. Citations to the Administrative Record, portions of which will appear in the Joint Appendix with pagination preserved, are preceded by "A.R. NLRB."

that the ripeness inquiry is meant to screen out. *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 736 (1998).

Nor is there merit to ABC's claim (Opp. 3), that it will suffer undue hardship if it can only obtain as-applied review after it incurs the "economic costs of participation in an election process that is invalid." The Supreme Court early established that litigation costs are not the type of hardship that justifies circumventing the review procedures of the National Labor Relations Act (NLRA or Act).[2] Nor can ABC avoid that precedent by citing language in *Texas*, 497 F.3d at 499, suggesting that required "participat[ion] in an allegedly invalid process" is cognizable harm in and of itself. *Texas* dealt with a state government, and the ripeness decision in that case was informed by the state's sovereign immunity. *Id.* at 494-95.[3] Private employers have no similar immunity, and are required to present their objections to the Board's processes through the statutory procedures that Congress established for that purpose. To the extent that the procedures for obtaining review of Board election cases are a hardship, it is one "Congress was aware of" and explicitly determined was not a cognizable injury. *Boire v. Miami Herald Pub. Co.*, 343 F.2d 17, 22 (5th Cir. 1965).

ABC also asserts that employers will suffer "reputational harm" from being found to have committed an unfair labor practice. (Opp. 3). But ABC has presented no evidence that any such

---

[2] *Myers v. Bethlehem Shipbldg. Corp.*, 303 U.S. 41, 51 (1938) ("[T]he rules requiring exhaustion of the administrative remedy cannot be circumvented by asserting that the charge on which the complaint rests is groundless and that the mere holding of the prescribed administrative hearing would result in irreparable damage."). ABC tries to muddle this issue (Opp. at 3) by conflating litigation costs with civil penalties, the issue in *Abbott Laboratories v. Gardner*, 387 U.S. 136, 152 (1967), but the two are plainly distinguishable. *Ohio Forestry*, 523 U.S. at 735 (litigation costs are not sufficient to constitute hardship for ripeness purposes).

[3] Requiring a party clothed with sovereign immunity to submit to an invalid adjudicative process is as much a violation of that immunity as is holding it liable for damages. *See, e.g.*, *Fed. Mar. Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 766 (2002). At issue in *Texas* was whether a state that refused to waive its immunity from being sued by an Indian tribe in federal court could nonetheless be subjected to a federal administrative process initiated by the tribe, even though that process denied the state the procedural protections Congress intended it to have, namely, a threshold judicial determination that the state had dealt with the tribe in bad faith. *Texas*, in short, does not state a general rule that any claimed defect in agency procedures constitutes a "hardship."

harm is likely to accrue to employers who test union certifications, nor is there any such evidence in the administrative record. This is unsurprising—there is no stigma attached to such a technical violation of the law because courts recognize that so refusing to bargain is precisely the means Congress prescribed for employers to test in court a decision certifying a union as bargaining representative. *See, e.g.*, *Boire v. Greyhound Corp.*, 376 U.S. 473, 477-79 (1964); *NLRB v. Douglas County Elec. Membership Corp.*, 358 F.2d 125, 127 (5th Cir. 1966) (describing the case as another "where the § 8(a)(5) failure to bargain is the vehicle for testing the validity of an RC Representation Proceeding"); *Hard Rock Holdings, LLC v. NLRB*, 672 F.3d 1117, 1120 (D.C. Cir. 2012) ("To preserve its ability to appeal the certification, the Company refused to bargain with the Union.").[4]

*BE&K Construction Co. v. NLRB*, 536 U.S. 516, 529 (2002), cited by ABC (Opp. 3), is distinguishable. There, the Board's unfair labor practice finding—that the employer had filed a baseless and retaliatory lawsuit—was a direct restraint on the employer's First Amendment right to petition the courts for relief. Far from being a comparable burden, a Board refusal-to-bargain finding is, in fact, the congressionally-sanctioned and judicially-recognized *predicate* to petitioning the courts to review the Board's application of its rules in certifying a bargaining representative.

## II.   The Rule does not reflect "arbitrary" or "capricious" decisionmaking.

ABC complains of the supposed onerousness of providing employee information to petitioning unions (the "voter list," in the Rule's parlance) two business days after the RD directs an election. (Opp. 8). But ABC fails to confront the Rule's detailed rebuttal of this contention. (Bd. MSJ 10-11). In reality, employers will have much more than two business days to start and complete

---

[4] Executive Order No. 13,673, 79 Fed. Reg. 45309 (July 31, 2014), cited by ABC as giving teeth to this abstract notion of "reputational harm" (Opp. 3), does nothing of the sort. It merely requires that employers who contract with the federal government report labor law violations to appropriate authorities, and directs the Federal Acquisition Regulatory Council to develop rules (aided by guidance to be developed by the Labor Department) to identify "serious, repeated, willful, or pervasive violations of the requirements of the labor laws" which might "demonstrate a lack of integrity or business ethics." 79 Fed. Reg. 45311-12. No such rule has yet issued.

the process. This is because employers will be placed on notice of the voter list requirement as soon as they receive the petition, which is served along with a description of election procedures. In addition, employers will have already compiled much of the information needed to comply with the voter list requirement when submitting their statement of position form, which is due one day prior to the opening of the pre-election hearing. (Bd. MSJ 11). And as the Rule explained, over the past decade, "half of all units contain[ed] 28 or fewer employees . . . meaning that even for those small employers which lack computerized records of any kind, assembling the information should not be a particularly time-consuming task." 79 Fed. Reg. 74354.[5]

In a footnote, ABC argues that *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009), requires the Board to articulate a "more detailed justification" for the Rule because the Rule purportedly "rests upon factual findings that contradict those which underlay its prior policy." *Id.* at 515; (*see* Opp. 12 n.9). Yet ABC fails to identify even one specific factual finding underlying prior policy that the Rule contradicts. As previously discussed, the Board has provided reasonable justifications for each amendment (Bd. MSJ 2, 7-11) and has done all that *Fox* requires. *See Fox*, 556 U.S. at 515.

---

[5] The Board fully explained why it rejected ABC's allegation that two days is insufficient for construction employers, who may need to use a voting eligibility formula requiring analysis of two years of payroll records. Not only may parties stipulate not to use that formula, but also, some petitions are for units already covered by collective-bargaining agreements, resulting in employers' ready access to the necessary information. The Board further explained that not all construction industry employers have significant numbers of employees covered by the formula, and finally, that although construction employers may have many job sites, modern technology renders transmission of the necessary information practicable. *Id.* at 74354.

Nor is ABC correct in arguing that construction employers cannot prepare in advance to submit a sufficient voter list. For even though construction employers need not include two years worth of employee information in their pre-hearing statements of position, those employers may still begin to assemble the information upon receipt of the notice of hearing. *Id.* at 74378. In addition, employers who do not agree to use a different eligibility formula by the close of a pre-election hearing can begin to prepare while the RD drafts a decision—"a task that has [taken] a median of 20 days . . . over the past decade." *Id.* at 74387. Finally, parties may agree to extend the voter list production deadline, or in extraordinary circumstances, the RD may so order. *Id.* at 74480, 74486.

**III.     Even if ripe, ABC's "appropriate hearing" arguments are meritless.**

ABC urges the Court to hold that the Board erred in basing its construction of Section 9's hearing requirements on *Inland Empire Dist., Lumber Workers v. Millis*, 325 U.S. 697, 706 (1945), which issued prior to the Taft-Hartley Amendments of 1947. (Opp. 5). As the Rule explains, however, the operative language of Section 9—that in its investigation of representation controversies, the Board "shall provide for an appropriate hearing upon due notice"—is the same in both the original and the amended statute. 79 Fed. Reg. 74386. In that circumstance, the Supreme Court's construction of that statutory language granting broad discretion to the Board remains controlling.[6]

Lacking textual support for its claim that Section 9 compels the Board to allow litigation of *all* individual eligibility or inclusion issues at the pre-election hearing, ABC urges this Court to find such a requirement in legislative history. Specifically, ABC claims that despite Congress not changing the "appropriate hearing" terminology, an individual legislator's statement in 1947 should illuminate Congress's intention in drafting that statutory language in 1935. The Supreme Court has squarely rejected this anachronistic mode of reasoning.[7] The Board was amply justified, therefore, in concluding that Senator Taft's statement is not binding law. *Id.* at 74386 n.363.

In any event, ABC's arguments based on Senator Taft's 1947 statement present an inaccurate account of the Rule's treatment of voter eligibility issues at pre-election hearings. For while the Board need not and does not decide every eligibility or inclusion issue that might arise before an election, such issues will continue to be litigated and decided as deemed necessary and

---

[6] *See NLRB v. Health Care & Ret. Corp. of Am.*, 511 U.S. 571, 578 (1994) (finding that Congress did not change the meaning of statutory language previously construed by the Court when it included that same language in an amended statute, notwithstanding Congress disapproved of the result reached by the Court in the prior decision).

[7] *See Oscar Mayer & Co. v. Evans*, 441 U.S. 750, 758 (1979) (legislative observations made years after a statute's passage "are in no sense part of the legislative history. It is the intent of the Congress that enacted [the section] . . . that controls.") (internal citations omitted). Even less defensible is ABC's repeated suggestion that actions taken by the current Congress under the Congressional Review Act of 1996 are a relevant consideration in this Court's statutory analysis. (Opp. 1, 6 n.3, 10 n.8).

desirable by the Agency's RDs. As the Rule recognizes, in exercising their discretion as to whether to permit pre-election litigation of voter eligibility issue, RDs will be guided, in part, by the Board's experience with the relative margins of victory in its elections. This experience suggests that deferring such litigation would result in a likely administrative savings to the parties and the Agency if the voter eligibility issues are limited to 10-20% of the unit; the eligibility of such a relatively small percentage of the electorate is unlikely to be determinative of the election results in the "vast majority of cases." *Id.* at 74387 n.370, 74388 & n.373. In contrast, if the voting eligibility of more than 40% of the unit were unresolved, it is much less likely that the election would be decided by a sufficiently wide margin as to moot the need to resolve all of the challenges before the election.

In short, ABC errs in alleging that an "extraordinary circumstances" standard governs whether voting eligibility issues may be litigated prior to the election. (Opp. 4, 6). Rather, "regional directors will not be mandated to follow any particular course of decision-making as to the taking of evidence on individual eligibility issues, but will instead retain discretion to use their judgment as to what evidentiary structure will result in the most efficient use of party and agency resources." 79 Fed. Reg. 74391-92. Granting that kind of discretion, as the Rule does, is well within the Board's Section 9 authority.

## IV.    Even if ripe, ABC's "time compression" arguments are meritless.

As the Board has shown, employers will continue to have ample meaningful opportunities to express their views on unions even if the Rule generally results in more expeditious elections. The Rule gave several reasons why this is so. (Bd. MSJ 18-19 & n.26). ABC challenges only one of them.

Specifically, ABC disputes the basis for the Board's finding that employers typically know about union organizing campaigns prior to the filing of a petition. (Opp. 11). But the Rule explains that pre-petition employer knowledge of union organizing activity has long been the norm. As the Supreme Court observed in *NLRB v. Gissel Packing Co.*, 395 U.S. 575 (1969), a union "[n]ormally . . .

6

will inform the employer of its organization drive early in order to subject the employer to the unfair labor practice provisions of the Act." *Id.* at 603. Indeed, as the facts of *Gissel* itself confirm, employers are typically aware of organization drives occurring at their facilities "whether informed by the union or not." *Id.* "[B]ased on its own experience," 79 Fed. Reg. 74321 n.56, which was supported by precedent, *id.* at 74321, an empirical study conducted by academic scholars, *id.* at 74321 n.56, and relevant practitioner feedback, *id.* at 74321 n.57, the Board appropriately concluded that "[w]hat was true at the time of *Gissel* is still true today," *id.* at 74320.

Even if, as ABC claims, some comments challenged the empirical study's methodology or the statistical value of the practitioner feedback, *id.* at 74321 nn. 56 & 57, it remains the case that these data points "are consistent with the Board's experience, and no contrary study was presented to the Board," *id.* at 74321. Nothing more is necessary to support the Board's finding. *See Nat'l Ass'n of Regulatory Util. Comm'rs v. FCC*, 737 F.2d 1095, 1140 (D.C. Cir. 1984) (per curiam) (agency may "rely upon its historical experience and expertise" in considering "a set of evidentiary facts less desirable or complete than one which would exist in some regulatory utopia").

Moreover, ABC's argument overlooks the Rule's discussion of why employers will still have a meaningful opportunity to campaign even if, contrary to the Board's informed judgment, "employer ignorance of an organizing campaign is the norm." 79 Fed. Reg. 74322. In support of this conclusion, the Board relied upon a variety of factors, including employers' "control [over] the quantum of work time which is used in conveying their message," *id.* at 74323, the "small size" of most bargaining units, *id.* at 74322, and the speech-facilitating features of "modern communications technology," *id.* at 74323. ABC does not challenge any of these considerations or the conclusion which they support.[8]

---

[8] Even if ABC had done so, such arguments would be better suited for an as-applied challenge, in which a specific period of time for speech is crystallized in the record so that a reviewing court could judge whether such time period did, in fact, infringe a party's speech rights.

In addition, as the Board has explained, nothing in the Act establishes an across-the-board minimum permissible campaign period. (Bd. MSJ 20). While ABC maintains that the Rule "shortens" that period "to a degree that is inconsistent with Congressional intent" (Opp. 9-10), it lacks any textual support for its claim. Instead, ABC contends that Congress implicitly endorsed a minimum campaign period of at least 30 days when it passed the Labor-Management Reporting and Disclosure Act of 1959 ("LMRDA"), which amended the NLRA in several respects. Terming these targeted amendments a "re-enactment" of the NLRA, ABC argues that Congress thereby ratified extant Board rules that, according to ABC, had "interpreted the Act as requiring substantially more than 30 days between a petition and an election, absent waiver by the parties." (Opp. 10).

Among the deficiencies of this "re-enactment" theory is that ABC cites no authority for the proposition that the Board's 1959 election rules required campaign periods in contested cases to last "substantially more than 30 days." (*Id.*) Board counsel have not been able to identify any such provision in the pertinent subparts of the Board's then-extant rules or statements of procedure. *See* 23 Fed. Reg. 3254, 3256-58, 3266-69 (May 14, 1958) (attached hereto as NLRB Exhibit A). Thus, ABC's "[c]ongressional re-enactment" argument suffers from a faulty premise. (Opp. 10). And even if ABC meant to argue instead that application of the Board's pre-LMRDA election procedures generally resulted in campaign periods greater than 30 days in contested cases, there is no evidence that this figure was expressive of any Board judgment that the Act sets a minimum length for election campaigns in such cases. Nor is there any evidence that in the 1959 amendments, Congress intended to legislatively enshrine the collateral timing consequences of the Board's pre-LMRDA election procedures. To the contrary, because of its concern over delays in the processing of election cases, Congress amended Section 3(b) of the NLRA, 29 U.S.C. § 153(b), "*to expedite final disposition of cases* by the Board, by turning over part of its caseload to its regional directors for final

determination." *Magnesium Casting Co. v. NLRB*, 401 U.S. 137, 141 (1971) (emphasis added) (quoting

105 Cong. Rec. 19770 (1959); A.R. NLRB 168396).[9]

## V.     The Rule reasonably modernizes the procedures surrounding employer disclosure of employee information.

ABC objects to the Rule's updating the existing requirement that the names and home

addresses of bargaining unit employees be disclosed prior to the election to include, where available,

email addresses and phone numbers as well. If employers have such additional contact information

on file, it is because they recognize, as the Rule does, that this is how people communicate today,

notwithstanding the known risks. Contrary to ABC's claim (Opp. 7-9), the Board reasonably

determined that these risks are worth taking in election cases to better ensure that employees have

the information they need to make a free choice in the election. In particular, the Board reasonably

relied on the nearly 50-year absence of evidence of misuse of the rule requiring disclosure of names

and addresses. 79 Fed. Reg. 74342. While ABC claims that the Board ignored contrary evidence, the

one case it cites concerns a union campaign misrepresentation, not a misuse of an employee's

personal information. *Goffstown Truck Ctr., Inc.*, 356 NLRB No. 33 (2010). And in relying on an

example of abuse unrelated to the Board election process, *Pulte Homes, Inc. v. Laborer's Int'l Union*, 648

F.3d 295 (6th Cir. 2011), ABC ignores the Board's reasoned judgment that unions seeking to win

support in a secret ballot election have a practical incentive to avoid conduct that would alienate

potential voters. 79 Fed. Reg. at 74336, 74342. In any event, if misuse should occur in the future, the

---

[9] As the Board has previously discussed, the version of the LMRDA ultimately enacted into law omitted a provision—championed by then-Senator John F. Kennedy—that would have authorized the Board to return to its pre-Taft-Hartley Act practice of dispensing with pre-election hearings in certain cases. (*See* Bd. MSJ 20). When House Education and Labor Committee Chairman Graham Barden declared that the LMRDA did not "reinstate authority or procedure for a quicky election," he was referring to this previously-proscribed procedure and was not implying that representation campaigns should have a minimum length. 105 Cong. Rec. 18128 (1959) (statement of Rep. Barden); A.R. NLRB 168390. ABC errs in suggesting otherwise. (Opp. 10 & n.7).

Board stands ready to fashion appropriate remedies, using its authority to rule on election objections or unfair labor practice charges and to discipline the parties before it. *Id.* at 74359.

ABC also objects to the Rule's requirement that employers include with the statement of position form (filed the day before the pre-election hearing), a list of names, shifts, work locations, and job classifications of the employees in the petitioned-for unit, as well as any other employees the employer seeks to add to the unit. *Id.* at 74309. ABC's claim that the Board failed to justify this new requirement overlooks the Board's explanation that disclosure of this information will facilitate the resolution of disputes over the contours of an appropriate unit and the eligibility of voters. *Id.* at 74366-67. ABC's claim (Opp. 9) that unions will "game the system" by filing a "deficient petition" merely to obtain the initial list takes no account of the fact that the disclosure requirement is only triggered after the RD has determined that there is reasonable cause to believe that a question of representation affecting commerce exists, 79 Fed. Reg. 74480, and that the petition is supported by at least 30% of employees in the unit, *id.* at 74371, 74421. Further, as the Board noted in addressing this concern, if a union should withdraw its petition after receiving this information, the RD may limit a petitioner's ability to refile a petition as a condition of approving the withdrawal, and the RD and the Board may reject a petitioner's request to withdraw the petition, "if the request would run counter to the purposes of the Act." *Id.* at 74368.

## VI.  Conclusion

For these reasons, and for those previously given, ABC's NLRA-based challenges to the Rule should be dismissed as unripe, ABC's remaining challenges should be denied, and summary judgment on those claims should be entered in favor of the Board.[10]

---

[10] ABC's fleeting reference (Opp. 4) to Amendment 6 (pre-election hearing will continue from day-to-day until completed) and Amendment 16 (RD will specify the election details in the direction of election) cannot be understood as proper challenges to the Rule, as ABC has never raised these provisions previously in either its complaint or its motion for summary judgment.

Respectfully submitted,

NANCY E. KESSLER PLATT
*Deputy Assistant General Counsel*

DAWN L. GOLDSTEIN
KEVIN P. FLANAGAN
*Supervisory Attorneys*

PAUL A. THOMAS
DAVID H. MORI
MICHAEL ELLEMENT
IGOR VOLYNETS
*Attorneys*

s/Barbara A. O'Neill
BARBARA A. O'NEILL
*Assistant General Counsel for Contempt,*
   *Compliance, and Special Litigation*
Phone: (202) 273-2958
Fax: (202) 273-4244
E-mail: barbara.oneill@nlrb.gov

National Labor Relations Board
1099 14th Street, NW, Suite 10700
Washington, D.C. 20570

Dated:  March 27, 2015
         Washington, D.C.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 27, 2015, the foregoing was served on the following via electronic ECF filing:

Maurice Baskin
Littler Mendelson, P.C.
1150 17th St. N.W.
Washington, DC 20036

Mark Jodon
Travis Odom
Littler Mendelson, P.C.
1301 McKinney Street
Suite 1900
Houston, Texas 77010-3031

Jason E. Winford
David E. Watkins
JENKINS & WATKINS
2626 Cole Avenue, Suite 200
Dallas, Texas 75204-0817

Raymond J. LaJeunesse
John N. Raudabaugh
Glenn M. Taubman
*c/o* National Right to Work Legal Defense & Education Foundation, Inc.
8001 Braddock Rd., Suite 600
Springfield, Virginia 22160

<u>s/ Barbara A. O'Neill</u>